1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JOHN GULLATT,                          )        1:07-CV-0873 OWW JMD HC
                                       )
              Petitioner,              )
                                       )        FINDINGS AND RECOMMENDATION
       v.                              )        REGARDING PETITION FOR WRIT OF
                                       )        HABEAS CORPUS
                                       )
TOM FELKER,                            )
                                       )
              Respondent.              )
_____)

       Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to

28 U.S.C. § 2254.

**BACKGROUND**

       Petitioner is currently in the custody of the California Department of Corrections pursuant to

a judgment of the Stanislaus County Superior Court.  In Case No. 1019871, a jury convicted him of

attempted robbery in concert with a firearm enhancement, attempted robbery, and two counts of

assault with a firearm.  Petitioner was also convicted of various other offenses in three other cases.

The trial court sentenced Petitioner to a term of ten years, six months in prison, plus a term of 25

years to life.  (Answer at 1-2.)

       Petitioner filed an appeal in the California Court of Appeal.  The court affirmed the judgment

in a reasoned opinion.  (Answer at 2; Lodged Docs. 1-2.)

       Petitioner filed a petition for review in the California Supreme Court.  The court summarily

1  denied review.  (Answer at 2; Lodged Docs. 3-4.)

2         Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  The

3  court summarily denied the petition.  (Answer at 2; Lodged Docs. 5-6.)

4         On June 18, 2007, Petitioner filed the instant petition in this Court.  The petition raises the

5  following three grounds for relief: 1) the trial court abused its discretion in denying Petitioner's

6  motion for new trial based on newly discovered evidence; 2) ineffective assistance of trial counsel;

7  and 3) prosecutorial misconduct.

8         On September 14, 2007, Respondent filed an answer to the petition.

9         On October 15, 2007, Petitioner filed a traverse to the answer.

10                              **FACTUAL BACKGROUND**[1]

11         On the evening of November 13, 2000, Patricia Gonzales and her daughter, Jamie, were

12  staying at the apartment of Patricia's sister and admitted drug dealer, Jacquie Owen, when three

13  armed men pushed their way into the apartment.  Their faces were covered with blue bandannas, and

14  they were wearing dark clothing and beanies.  The men demanded that Patricia give them her money.

15  Patricia kept repeating she did not have any money.  One of the men stood in front of Patricia with

16  his gun pointed at her "[t]he whole time."  After repeatedly insisting she had no money, she saw his

17  finger begin squeezing the trigger.  Patricia threw her hands up to protect herself.  The man shot her

18  in the finger and shoulder.  The three intruders then fled the apartment.  At trial, Jamie identified

19  Petitioner as the shooter based on his distinctive hair braid, which she had recognized at the

20  conclusion of the preliminary hearing.

21         Petitioner's former girlfriend, Michelle Owens, testified that on the evening of November 13,

22  2000, Petitioner told Michelle that he was going to "do a job," and then left the house for over an

23  hour.  The following day, Michelle saw a news story about the robbery on television and heard

24  Petitioner talking with others in her garage about the robbery.  When the news story was airing,

25  Michelle said to Petitioner, "I didn't know she got shot."  Petitioner responded, "You're the last

26  person that I would want to know."  Later, Michelle contacted Modesto Police Detective Allan

27

28
―――――――――――
        [1]  The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of July 27, 2005 and are presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 2.

1    Brocchini and told him she thought Petitioner committed the crimes.  Michelle also told Detective

2    Brocchini that Petitioner told her they "didn't get nothing" and that the gun went off by accident.

3         On cross-examination Michelle denied the truth of her previous statements to Detective

4    Brocchini, that Petitioner admitted to shooting the victim.  Michelle explained she called the

5    detective because she was angry with Petitioner after learning Petitioner cheated on her and had a

6    baby with Sherry Whaley, for whom he left Michelle to be with on Christmas day and later married.

7    Michelle and Petitioner also have a child together.  All Michelle knew about the robbery was based

8    on the conversation she heard in the garage between Petitioner's nephew "Chilli" and two individuals

9    known as "Oscar" and "Corn."  Petitioner was asking them questions, but he never admitted being

10   involved.  Based on the details of the robbery she heard discussed in the garage, and details the

11   detective told her, Michelle falsely told the detective that Petitioner had related similar details to her

12   regarding the crimes.  Michelle testified that she continually lied to the detective and told him what

13   he wanted to hear.

14        Elizabeth Beck, a welfare fraud investigator, testified that she interviewed Michelle on March

15   6, 2001, after Petitioner reported Michelle for welfare fraud.  During the interview, Michelle told

16   Beck that she had overheard Petitioner and his nephew Chilli talking about robbing a lady and the

17   fact the robbery would be easy because it was a woman who held money for a man who was the

18   main drug dealer.  If there were any problems with the robbery or it went bad, they would just "pop

19   her."  Michelle also told Beck that Petitioner admitted to shooting the lady the next day when they

20   were watching television.

21        James "Chilli" Washington testified against Petitioner under an agreement to a five-year

22   reduction of his sentence on another armed robbery conviction and the dismissal of the charges in the

23   current case.  Washington testified that on November 13, 2000, Petitioner told Washington he

24   wanted to borrow a gun so he could rob Jacquie.  Washington let him borrow it, but went with

25   Petitioner to make sure he got his gun back.  Two of Petitioner's "home boys" drove with them to

26   Jacquie's apartment complex.  When they arrived, Washington walked to a location across the street

27   from the apartment complex.  Washington saw the others enter the front door of the apartment.

28   About a minute later, Washington heard a shot.  Washington tried to go back to the car but it was

1    gone.

2          After hearing police sirens, Washington walked to a nearby bowling alley and started playing

3    a video game.  While he was at the bowling alley, Petitioner called and said the robbery went bad

4    and he thought he "hit her in the neck."  Petitioner said he threw the gun over the wall and asked

5    Washington to get it for him because Petitioner thought his prints were on it.  The next day,

6    Washington, Petitioner, and two others were in Michelle's garage talking about the robbery.

7    Petitioner asked Washington if he had gotten rid of the gun.  Washington said he had.  Petitioner told

8    Washington that the shooting was an accident.

9          Heriberto Ortega, a jail mate of Petitioner, testified pursuant to an agreement with the district

10   attorney concerning a charge unrelated to the current case.  Ortega testified that Petitioner told him

11   the gun went off by accident.

12         The Defense

13         Petitioner's neighbors, Rhonda Crowe and Lisa Beard, testified that on the night of November

14   13, 2000, Petitioner was watching football at Sherry Whaley's place next door.  Crowe and Beard

15   spoke with Petitioner periodically over a six-foot fence which connected their home to Whaley's.

16   The time period during which they saw Petitioner was from 6:00 to 10:00 p.m.

17         Private investigator Jack Vines testified it is not possible to see the front entrance of Jacquie's

18   apartment from the location Washington claimed to have stood during the robbery.

19                                        **DISCUSSION**

20   **I. Jurisdiction**

21         Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

22   to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

23   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

24   375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

25   Constitution.  In addition, the conviction challenged arises out of the Stanislaus County Superior

26   Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. §

27   2241(d).  Accordingly, the Court has jurisdiction over the action.

28         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

2 Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997),

3 *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997),

4 *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only

5 applicable to cases filed after statute's enactment). The instant petition was filed after the enactment

6 of the AEDPA; thus, it is governed by its provisions.

7 **II.  Legal Standard of Review**

8 This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

9 pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

10 Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

11 The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

12 Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003).

13 Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of

14 the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,

15 clearly established Federal law, as determined by the Supreme Court of the United States" or

16 "resulted in a decision that was based on an unreasonable determination of the facts in light of the

17 evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at

18 70-71; see Williams, 529 U.S. at 413.

19 As a threshold matter, this Court must "first decide what constitutes 'clearly established

20 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

21 *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court

22 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

23 of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words,

24 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set

25 forth by the Supreme Court at the time the state court renders its decision." Id.

26 Finally, this Court must consider whether the state court's decision was "contrary to, or

27 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

28 *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant

1  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

2  question of law or if the state court decides a case differently than [the] Court has on a set of

3  materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72.

4  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

5  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

6  that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

7       "[A] federal court may not issue the writ simply because the court concludes in its

8  independent judgment that the relevant state court decision applied clearly established federal law

9  erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id.</u> at 411.  A

10  federal habeas court making the "unreasonable application" inquiry should ask whether the state

11  court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

12       Petitioner has the burden of establishing that the decision of the state court is contrary to or

13  involved an unreasonable application of United States Supreme Court precedent.  <u>Baylor v. Estelle</u>,

14  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

15  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

16  decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir.

17  1999).

18       AEDPA requires that we give considerable deference to state court decisions.  The state

19  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

20  interpretation of its own laws.  <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*,

21  537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

22  **III.  Review of Petitioner's Claims**

23       **A.  Ground One**

24       Petitioner argues that the trial court abused its discretion in denying his motion for new trial

25  based on newly discovered evidence.  Petitioner further claims that additional newly discovered

26  evidence shows that he is actually innocent of the crimes for which he was convicted in Case No.

27  1019871.

28       Petitioner presented this claim, along with a portion of the newly discovered evidence, in an

1  appeal to the California Court of Appeal.  The court affirmed the judgment in a reasoned opinion.

2  (Lodged Docs. 1-2.)  Petitioner then presented the claim, along with all of the newly discovered

3  evidence, in a petition for writ of habeas corpus to the California Supreme Court.  The court

4  summarily denied the petition.  (Lodged Docs. 5-6.)  When the state court reaches a decision on the

5  merits but provides no reasoning to support its conclusion, we independently review the record to

6  determine whether the state court clearly erred in its application of Supreme Court law.  Pirtle v.

7  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  However, although we independently review the

8  record, we still defer to the state court's ultimate decision.  Id.

9       "Newly discovered evidence is a ground for habeas relief only when it bears on the

10  constitutionality of an appellant's conviction and would probably produce an acquittal."  Spivey v.

11  Rocha, 194 F.3d 971, 979 (9th Cir. 1999); Harris v. Vasquez, 949 F.2d 1497, 1523 (9th Cir. 1990);

12  Swan v. Peterson, 6 F.3d 1373, 1384 (9th Cir. 1993).

13       Petitioner has submitted several declarations in support of his claim of actual innocence.

14  Michelle Owens, who was Petitioner's wife at the time of the crime, states that she informed the

15  police that Petitioner was involved in the robbery only because she was angry that he had an affair

16  with another woman.  (Petition, Ex. 2 at 1.)  She also states that Detective Brocchini pressured her

17  into testifying against Petitioner by threatening to have her kids taken away.  (Id.)  Sherry Whaley,

18  who was Petitioner's girlfriend, and Pam Whaley Fowler, who is Sherry's mother, both state that

19  Petitioner, James Washington, and two Hispanic males came to their residence on the day of the

20  crime.  Petitioner then lent his vehicle to Washington who left with the two Hispanic males.

21  Petitioner remained at the residence during the time of the crime, only leaving to retrieve his car after

22  he received a call from Washington between 7:30 and 8:00 p.m.  (Petition, Ex. 3 at 1-2; Ex. 4 at 1-2.)

23       Petitioner's newly discovered evidence is insufficient, however, to show that Petitioner

24  would have probably been acquitted if the evidence was introduced at trial.  Michelle Owens testified

25  on cross-examination that Detective Brocchini threatened to have her kids taken away if she did not

26  talk to him and tell him the things he wanted to hear.  (RT at 520-21, 541-42.)  She also testified that

27  she had lied about Petitioner's involvement in the crime because she was angry that he had an affair

28  with another woman.  (RT at 528-32, 541-42.)  As recognized by the trial court and Court of Appeal,

1  Ms. Owens's declaration does not set forth any new evidence that was not presented at Petitioner's

2  trial.  (Lodged Doc. 2 at 13, 16.)

3       The declarations of Ms. Whaley and Ms. Fowler are also insufficient to show that Petitioner

4  would have probably been acquitted at trial, as their statements are largely cumulative of other trial

5  testimony.  Rhonda Crowe testified on behalf of the defense that she and her friend Lisa Beard lived

6  in a house that had a yard adjoining the yard of Sherry Whaley's house.  (RT at 1090.)  Ms. Crowe

7  stated that, on the day of the crime, she and Lisa were barbecuing in the backyard and watching a

8  televised football game that began at approximately 6:00 p.m.  Petitioner was at Sherry Whaley's

9  house watching the same game.  (RT at 1094-95.)  Ms. Crowe testified that frequently throughout the

10  game, including at high points in the game, during commercials, and during halftime, she and

11  Petitioner would discuss the game at the fence separating the two yards.  (RT at 1095-96, 1103.)  Ms.

12  Crowe last saw Petitioner at approximately 10:00 p.m.  (RT at 1096.)  Ms. Beard similarly testified

13  that, beginning about 5:45 or 6:00 p.m., she and Ms. Crowe would speak with Petitioner at the fence

14  separating the yards when a team scored, during commercials, and at other points in the game.  (RT

15  at 1180-81.)  Ms. Beard further stated that she talked to Petitioner during halftime of the game and

16  that she talked to him "a lot" after halftime.  (RT at 1182.)

17       The statements of Ms. Whaley and Ms. Fowler that Petitioner never left their house around

18  the time of the robbery are largely cumulative of the testimony of Crowe and Beard that they

19  frequently and repeatedly discussed the ongoing football game with Petitioner around the time of the

20  robbery.  While the Whaley and Fowler declarations are more explicit that Petitioner never left the

21  house, the jury would have also been more likely to discount their statements since Whaley, as

22  Petitioner's pregnant girlfriend, and Fowler, as her mother, had a greater motive to fabricate

23  testimony than Crowe and Beard who were merely neighbors who considered Petitioner to be a

24  friend or acquaintance.  (RT at 1089-90, 1175.)

25       Further, even if the statements of Ms. Whaley and Ms. Fowler had been presented, it is still

26  unlikely that Petitioner would have been acquitted, as there was significant evidence of his guilt.

27  Jamie Gonzalez, one of the victims, identified Petitioner as the shooter at trial based on his

28  distinctive hair braid that she noticed during the crime and later at a preliminary hearing.  (RT at

385-88.)  Elizabeth Beck, a welfare fraud investigator, testified that Michelle Owens told her that

Petitioner had admitted he participated in the robbery.  (RT at 571-77.)  James Washington testified

that Petitioner asked to borrow his gun to commit the robbery, then committed the robbery with

accomplices while Washington waited outside.  (RT at 599-607, 618-19.)  Heriberto Ortega also

testified that Petitioner admitted to him that he had participated in the robbery and told him of

specific details of the crime.  (RT at 825-29.)

### B. Ground Two

Petitioner argues that his trial counsel was ineffective in not adequately investigating and

presenting evidence of his alibi.  Petitioner claims that, at a minimum, counsel should have

interviewed and presented the testimony of Sherry Whaley, Michelle Owens, and Pam Fowler.

Petitioner presented this claim in a petition for writ of habeas corpus to the California

Supreme Court.  The court summarily denied the petition.  (Lodged Docs. 5-6.)  When the state court

reaches a decision on the merits but provides no reasoning to support its conclusion, we

independently review the record to determine whether the state court clearly erred in its application

of Supreme Court law.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  However, although

we independently review the record, we still defer to the state court's ultimate decision.  Id.

The law governing ineffective assistance of counsel claims is clearly established for the

purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151

F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective

assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668,

687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that

counsel's performance was deficient, requiring a showing that counsel made errors so serious that he

or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466

U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard

of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of

reasonable professional judgment considering the circumstances.  Id. at 688; United States v.

Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is

highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the

1   wide range of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. at 687; <u>Sanders v. Ratelle</u>, 21

2   F.3d 1446, 1456 (9th Cir. 1994).

3       Second, the petitioner must demonstrate that "there is a reasonable probability that, but for

4   counsel's unprofessional errors, the result ... would have been different."  <u>Strickland</u>, 466 U.S. at 694.

5   Petitioner must show that counsel's errors were so egregious as to deprive the defendant of a fair

6   trial, one whose result is reliable.  <u>Id.</u> at 688.  The court must evaluate whether the entire trial was

7   fundamentally unfair or unreliable because of counsel's ineffectiveness.  <u>Id.</u>; <u>Quintero-Barraza</u>, 78

8   F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1356, 1461 (9th Cir. 1994).

9       A court need not determine whether counsel's performance was deficient before examining

10  the prejudice suffered by the petitioner as a result of the alleged deficiencies.  <u>Strickland</u>, 466 U.S. at

11  697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in

12  prejudice must necessarily fail.  However, there are certain instances which are legally presumed to

13  result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of

14  counsel or where the State has interfered with counsel's assistance.  <u>Strickland</u>, 466 U.S. at 692;

15  <u>United States v. Cronic</u>, 466 U.S. 648, 659 & n.25 (1984).  Ineffective assistance of counsel claims

16  are analyzed under the "unreasonable application" prong of *Williams v. Taylor*, 529 U.S. 362 (2000).

17  <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

18      Petitioner has not shown that counsel was deficient in failing to interview the witnesses in

19  question, as their declarations do not state that they were never interviewed.  (Petition, Exs. 2-4.)  In

20  fact, the declarations of Ms. Whaley and Ms. Fowler show that counsel was aware of their expected

21  testimony prior to trial, as each states that counsel was made aware of the potentially exculpatory

22  evidence and that he stated the evidence was crucial to Petitioner's defense.  (Petition, Exs. 3-4.)  In

23  addition, even if counsel was deficient in failing to interview or call witnesses, Petitioner has not

24  shown that he suffered prejudice as a result.  Ms. Owens testified at trial regarding the information

25  contained in her declaration.  Further, the statements of Ms. Whaley and Ms. Fowler are largely

26  cumulative of the testimony of Rhonda Crowe and Lisa Beard as discussed above and, in any case,

27  are insufficient to establish a reasonable probability of a different result given the totality of the

28  evidence.

**C.  Ground Three**

Petitioner argues that his conviction was the result of prosecutorial misconduct.  He claims that Detective Brocchini pressured Michelle Owens to give perjured testimony against him by threatening to have her children taken away.

Petitioner presented this claim in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion.  (Lodged Docs. 1-2.)  The claim was not presented in the petition for review.  (Lodged Docs. 3-4.)  Petitioner did raise the claim, however, in a petition for writ of habeas corpus to the California Supreme Court.  The court summarily denied the petition. (Lodged Docs. 5-6.)

In rejecting Petitioner's claim, the Court of Appeal found that he did not demonstrate any harm resulting from prosecutorial misconduct as Michelle Owens provided favorable testimony to Petitioner despite her allegations of feeling pressured by Detective Brocchini to do otherwise. (Lodged Doc. 2 at 19.)

"It is well established that substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.  Moreover, coercive or threatening behavior towards a potential witness may justify reversal of a defendant's conviction." Earp v. Ornoski, 431 F.3d 1158, 1170-71 (9th Cir. 2005) (citations and quotation marks omitted); accord U.S. v. Little, 753 F.2d 1420, 1438-39 (9th Cir. 1984).

In support of his claim, Petitioner has submitted the declarations of Michelle Owens and Shannan Fisher.  Ms. Owens states that Detective Brocchini initially pressured her into saying it was Petitioner who committed the crime, then continued to pressure her into accusing Petitioner by threatening to have her children taken away if she changed her testimony.  (Petition, Ex. 2.)  Shannan Fisher states that Detective Brocchini told her that, if she disclosed information about the robbery, he could get unrelated drug charges against her dismissed.  (Petition, Ex. 5.)

The state court's determination that Petitioner did not demonstrate harm resulting from prosecutorial misconduct was not unreasonable.  Ms. Owens, despite the alleged pressure being placed on her, testified regarding the threats made by Detective Brocchini and regarding the fact she lied about Petitioner's involvement in the robbery.  (RT at 520-21, 528-32, 541-42.)  Further, Ms.

1   Fisher, in her declaration, acknowledges that she did not have any information to provide Detective

2   Brocchini about the robbery and that he never spoke to her after the date of the alleged threat.

3   (Petition, Ex. 5.)  Petitioner has therefore not shown that any of the alleged threats substantially

4   interfered with a witness's ability to testify truthfully.

5                                          **RECOMMENDATION**

6            Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

7   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

8   Respondent.

9            This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

10  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

11  of the Local Rules of Practice for the United States District Court, Eastern District of California.

12  Within thirty (30) days after being served with a copy, any party may file written objections with the

13  court and serve a copy on all parties.  Such a document should be captioned "Objections to

14  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

15  filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.

16  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

17  parties are advised that failure to file objections within the specified time may waive the right to

18  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19

20  <u>IT IS SO ORDERED.</u>

21  **Dated:      October 20, 2008                          /s/ John M. Dixon**
                                            UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28